**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1503**

AMANDA DEANNE SMITH,

        Plaintiff - Appellee,

    v.

OFFICER R. R. RAY,

        Defendant – Appellant,

    and

OFFICER JAY KEATLEY,

        Defendant,

    and

CITY OF VIRGINIA BEACH; CITY OF VIRGINIA BEACH POLICE
DEPARTMENT; ALFRED M. JACOCKS, JR., Chief of Police, City of
Virginia Beach; SERGEANT T. T. YARBROUGH; KEVIN MURPHY, MPO;
SERGEANT ARMAND RUBBO; SERGEANT JARVIS LYNCH; OFFICER SCOTT
STEIN; DONALD AUTSIN, MPO; JOHNNY MONTS, MPO; JAMES HEWLETT,
MPO; TONY F. BULLARD,

        Consolidated Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk.  Douglas E. Miller, Magistrate
Judge.  (2:08-cv-00281-DEM)

Argued:  January 27, 2015        Decided:  March 18, 2015

Before TRAXLER, Chief Judge, and GREGORY and AGEE, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Gregory and Judge Agee joined.

_____

**ARGUED**: Michael Beverly, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia, for Appellant. Darren Marshall Hart, HART & ASSOC., P.C., Richmond, Virginia, for Appellee. **ON BRIEF**: Mark D. Stiles, Christopher S. Boynton, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia, for Appellant.

_____

TRAXLER, Chief Judge:

Officer R. R. Ray appeals a district court order denying his motion for summary judgment on the basis of qualified immunity concerning Amanda Smith's excessive force claim. Finding no error, we affirm.

I.

"In reviewing the denial of summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff." Waterman v. Batton, 393 F.3d 471, 473 (4th Cir. 2005). "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." Id. Application of these rules produces the following facts.[1]

On the afternoon of September 21, 2006, Officer R. R. Ray, a uniformed police officer for the City of Virginia Beach, was assisting private citizen Tony Bullard in finding T., who Bullard had represented was his missing juvenile stepson. Bullard and Ray had information that T. was at a house on Marlewood Way, which was an area with a high occurrence of

---

[1] We note that the accounts of Officer Ray and other witnesses are very different from Smith's.

3

criminal activity involving juveniles. When they arrived there, they looked through a window and saw several young men standing inside the residence. Bullard tentatively identified one of the young men as T. Ray then knocked on the door of the house and heard "scurrying" sounds coming from inside.

Smith opened the main door of the home. When Ray instructed her to come outside, she opened the screen door and stepped out. Both doors closed behind her.

At that point, Smith was standing on the front stoop, which was two or three steps up from the ground and which extended about one foot wider than the front door on each side. Ray asked Smith a few questions, as Bullard stood a few steps back. Smith answered all of Ray's questions clearly and cogently. He first asked her name and age and whether she owned the home. Smith told Ray her first name and that she was 22 years old, and she explained that she did not reside in the home. Ray then asked if T. was inside, and Smith answered that he was not.

Ray next asked if "Joel," an adult acquaintance of T.'s, was in the home. Smith told Ray that Joel was there and that she would get him. She asked Ray to "hold on," as she turned back toward the door. J.A. 1077. As she opened the screen door, Ray reached over her right shoulder and slammed the door shut. Startled, Smith took a single step away from the house off the small stoop but did not turn her back to Ray. According

4

to Smith, Ray grabbed her arm with no verbal communication. Smith pulled her arm away, and, facing Ray, asked what he was doing. Rather than responding verbally, Ray tried to grab Smith again, and she again pulled her arm away. In the process of pulling away and asking what Ray was doing, Smith called Ray – who is white – a n****r. However, she did not turn away from Ray or run.

Rather than explain his actions, Ray grabbed Smith and threw her to the ground. When she hit the ground, he jumped on her, jamming his full weight into her back with his knee, and painfully twisting her right arm behind her back.

At that point, Ray ordered Smith to show him her arms. Ray already had her right arm, however, and Smith was using her left arm to press against the ground to try to relieve pressure from her chest so that she could breathe. As Smith resisted Ray's attempts to force her to submit, Ray continued to demand that she show her hands, and she repeatedly responded that she needed to keep her arm under her to breathe because he was pressing down so hard on her. Ray subsequently punched her three times in her right side to try to gain her compliance. He then succeeded in yanking her left arm around and handcuffing her.[2]

_____

[2] Another officer may also have arrived on the scene and assisted Ray in handcuffing Smith.

Once she was handcuffed, he grabbed her ponytail and yanked her to her feet by her hair, ripping chunks of hair from her scalp.

At some point during this struggle, a small pocketknife fell to the ground from Smith's sweatshirt, although Ray did not notice the knife until Smith was standing and in handcuffs. Throughout the encounter, Smith never struck out at Ray, and Ray never explained that Smith was subject to an investigative detention or under arrest.

Ray brought Smith to his police car, searched her, and put her into the back seat. He eventually drove her to the police station. She was taken before a magistrate and charged with obstruction of justice and unlawfully carrying a concealed weapon.

As a result of Ray's actions, Smith suffered visible bruising and a broken rib, and she also complains of continuing shoulder pain and limited range of motion due to the arm twisting. She further claims that she suffered psychological injuries.

Smith brought suit in Virginia state court alleging multiple claims against Ray and another unknown officer, and the case was removed to federal district court. The somewhat complicated procedural history of this case and Smith's other claims and the factual basis therefor are fully explained in our opinion disposing of a prior appeal and in the district court's

6

opinion at issue in this appeal. See Smith v. Ray, 409 Fed. App'x 641, 644-45, 2011 WL 317166, at *2-3 (4th Cir. 2011); Smith v. Ray, 855 F. Supp. 2d 569, 573-74 (E.D. Va. 2012). The only claims remaining at this stage of the litigation, however, are Smith's § 1983 claim against Ray for excessive force and her state-law claim against Ray for assault and battery. See Smith, 855 F. Supp. 2d at 594. Both parties moved in the district court for summary judgment on these claims, with Ray seeking summary judgment on the excessive-force claim on the basis of qualified immunity. The district court denied both motions. See id.

In denying Ray's motion, the court noted that Smith was not suspected of any crime prior to the encounter, Ray had no arrest warrant, and Smith was lawfully on the porch of the private residence. See id. at 580. Viewing the record in the light most favorable to Smith, the court added that "she was not intoxicated, or belligerent," and that Ray did not learn that she was carrying a knife until after she was in handcuffs. Id. The court concluded that, in light of these facts, a reasonable jury could find that Ray employed excessive force in detaining Smith. See id. Considering the state of the law as it existed at the time of the incident, the court also determined that any reasonable officer in Ray's position would have known that the force used was excessive. See id. at 580-82.

7

On appeal to us, Ray argues that the district court erred in denying his summary judgment motion concerning the excessive-force claim. We disagree.

We review de novo a district court's decision to deny a summary judgment motion asserting qualified immunity. See Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks omitted).

In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, courts engage in a

two-pronged inquiry.[3]  See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014) (per curiam).  The first asks whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a federal right.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  When a plaintiff has alleged that an officer employed excessive force in making an arrest, the federal right is the Fourth Amendment right against unreasonable seizures.  See Tolan, 134 S. Ct. at 1865.

The second prong of the qualified-immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional.  See Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006).  "We do not require a case directly on point" in order to conclude that the law was clearly established so long as "existing precedent [has] placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).

An order denying summary judgment on the basis of qualified immunity is immediately appealable under the collateral order

_____

[3] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

doctrine because qualified immunity provides not only immunity from liability, but also immunity from suit. See Mitchell v. Forsyth, 472 U.S. 511, 526-30 (1985). However, the conclusion of the district court that a disputed issue of fact exists as to a particular point is not appealable under the collateral order doctrine. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996). Rather, on appeal from the denial of summary judgment on the basis of qualified immunity, we merely decide whether on the facts assumed by the district court for summary judgment purposes, the defendant was entitled to qualified immunity. See id.

A claim that a police officer employed excessive force is analyzed under the Fourth Amendment under an "objective reasonableness" standard. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The officer's actions do not amount to excessive force if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). In considering the reasonableness of an officer's actions, we must consider the facts at the moment that the challenged force was employed. See Henry, 652 F.3d at 531.

Evaluating the reasonableness of the officer's actions "requires a careful balancing of the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). To properly consider the reasonableness of the force employed we must "view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." Waterman, 393 F.3d at 481 (internal quotation marks omitted). We also must give "careful attention to the facts and circumstances of each particular case, including" three factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Ultimately, the question to be decided is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." Tennessee v. Garner, 471 U.S. 1, 8–9 (1985).

Here we conclude that the district court properly denied Ray's summary judgment motion. The facts of this case are strikingly similar to those we considered in Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994). In that case, a police officer witnessed a woman drop a five-dollar bill in a bus station and saw Rowland, a 37-year old, "mildly retarded" man, pick it up

without returning it.  Id. at 171.  The officer approached Rowland and told him to return the money to the woman who had dropped it.  See id.  Rowland walked over to the woman and offered it to her but she stated that it was not hers.  See id. Rowland then left the bus station.  See id.

Rowland was standing at a street corner when the officer approached, and Rowland never attempted to flee.  See id. Without being provoked, the officer grabbed Rowland's collar, jerked him around, and yelled at him.  See id. at 172. Frightened by the sudden assault, Rowland instinctively tried to escape the officer's grasp.  See id.  The officer responded by punching Rowland and throwing him down, "throwing his weight against Rowland's right leg and wrenching the knee until it cracked," tearing Rowland's anterior cruciate ligament.  Id.

As is relevant here, we reviewed a denial by the district court of the officer's motion for summary judgment on Rowland's excessive-force claim on the basis of qualified immunity.  The officer argued that we should take a "segmented view of the sequence of events" and hold that each step taken by the officer was reasonable based on Rowland's immediately preceding actions. Id. at 173.  We rejected this approach, however, concluding that it "miss[es] the forest for the trees."  Id.  Rather, we determined that "[t]he better way to assess the objective reasonableness of force is to view it in full context, with an

12

eye toward the proportionality of the force in light of all the circumstances." Id.

Viewing the officer's actions in this manner, we concluded that the crime at issue was a minor one and that there was no evidence that the "relatively passive, retarded man was a danger to the larger, trained police officer." Id. at 174. We also noted that "Rowland maintain[ed] that he resisted only to the extent of instinctively trying to protect himself from the defendant's onslaught." Id. With the Graham factors so unfavorable to the officer, we concluded that the district court properly determined that he was not entitled to summary judgment on the basis of qualified immunity. See id.

A similar analysis leads to the same conclusion in the present case.[4] Regarding the first Graham factor, severity of the suspected crime, at the time Ray grabbed Smith's arm without explanation, he at most had reason to suspect that she may be guilty of the misdemeanor of contributing to the delinquency of a minor, see Va. Code § 18.2-371; Smith, 409 Fed. App'x at 648, 2011 WL 317166, at *6 (concluding that "a reasonable officer . . . would have had a basis for suspecting that Smith was contributing to the 'delinquency of a minor'"). As in Rowland,

---

[4] The distinction between Rowland (and this case) and the cases of Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), and Brockington v. Boykins, 637 F.3d 503 (4th Cir. 2011), is explained in Waterman. See Waterman, 393 F.3d at 481.

13

this nonviolent misdemeanor offense was not of the type that would give an officer any reason to believe that Smith was a potentially dangerous individual. See Young v. County of Los Angeles, 655 F.3d 1156, 1165 n.8 (9th Cir. 2011) ("While the fact that Young was suspected only of misdemeanor offenses weighs against a finding that the use of significant force against him was justified, it is ultimately the nonviolent and relatively minor nature of his suspected offenses that is of more importance."); Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.").

The second Graham factor, whether the suspect poses an immediate threat to the safety of the officers or others, weighs even more strongly in Smith's favor. Ray "is a pretty good size man," while Smith "is a smaller woman." J.A. 1143; see also J.A. 1086 (Smith's testimony that she "was being attacked by a 200-something-pound man"). Ray did not have any reason to believe that Smith was armed. And, up to the point that Ray grabbed Smith, Smith had answered Ray's questions clearly and cogently and given no indication that she was at all inclined to cause him any harm or that she had any capacity to do so, especially with Bullard standing only a few steps away.

14

The third Graham factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, also strongly favors Smith. Before Ray slammed the screen door shut, Smith had been fully compliant and responsive to Ray's instructions and questions. Even when Ray surprised her by slamming the screen door closed, she took only a single step back off of the small stoop in front of the door. In so doing, she neither turned her back to Ray, nor attempted to flee. When Ray grabbed Smith without warning or explanation, Smith's reaction, like Rowland's, was to instinctively attempt to pull herself from his grasp. But even at this point, she did not strike at Ray, attempt to flee the scene, or even turn her back to him. Rather, she simply pulled her arm away and, as she stood facing him, demanded (angrily) to know what he was doing.

Ray argues that he reasonably perceived Smith to be attempting to flee. Even assuming arguendo that he might have reasonably perceived her as attempting to flee in the moment in which she took one step off of the stoop, she took no further steps after that one, and remained facing Ray as she demanded an explanation for why he was trying to grab her. A reasonable jury could find that at that moment any perception by Ray that Smith had attempted or was attempting to flee would have been unreasonable. See Tolan, 134 S. Ct. at 1866-68 (on appeal of grant of summary judgment on basis of qualified immunity,

15

holding that court must draw inferences in favor of plaintiff where officers' testimony concerning what they perceived was at odds with testimony of other witnesses regarding how dark the area was, whether a woman spoke to officers in an agitated tone, whether her son was screaming, whether his words amounted to a threat, and whether the son was "looking as if he was going to move forward" to intervene in an officer's altercation with his mother).

Especially in light of Rowland, no reasonable officer could have believed that, rather than answer the previously compliant young woman's legitimate question concerning why Ray was suddenly grabbing her, Ray was justified in throwing her to the ground, slamming his knee into her back, and wrenching her arm behind her. Not only did that violent response subject Smith to an obvious risk of immediate injury, it also created the very real possibility that, as in Rowland, the attack would continue to meet with frightened resistance, leading to an even further escalation of the violence. See Rowland, 41 F.3d at 174 ("Rowland maintains that he resisted only to the extent of instinctively trying to protect himself from the defendant's onslaught."). Indeed, under Smith's version of the facts, that is exactly what happened.

Nor could a reasonable officer believe that Smith's initial act of pulling her arm away when Ray grabbed her without warning

16

or explanation justified Ray's decision to throw her down, jam his leg into her back, and wrench her arm behind her. Such a "segmented" approach is exactly the one we rejected in Rowland. Id. at 173. Smith had been fully compliant and responsive up to the point that Ray attempted to grab her without warning or explanation. That she instinctively took one step back when he startled her by suddenly slamming the door shut or that she pulled her arm from Ray's grasp and angrily demanded that he explain himself did not give him license to significantly escalate the situation by throwing her down and jumping on her, as any reasonable officer would have known.

For similar reasons, Smith's refusal to submit after he threw her down cannot justify Ray's decision to punch Smith repeatedly, breaking her rib. Under her version of events, she was simply defending herself against a sudden all-out physical assault from an officer who had not given her any indication that he was acting with any legal justification. She never struck out at Ray, but was struggling to keep her arm under her so that she could breathe, and she told Ray as much. Given the obvious excessiveness of the force Ray had employed up to that point, he cannot use her slight resistance to the attack to justify his escalation of the conflict. Nor could he justify

17

yanking her up by her hair once she was handcuffed and under his control.[5]

In arguing that the unconstitutionality of his conduct was not clearly established on the day in question, Ray attempts to draw fine distinctions between the facts of the present case and those of Rowland. However, our determination that the officer was not entitled to qualified immunity in Rowland was not based on any case that was factually on all fours. Rather, it was based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself. See id. at 174.

Moreover, the factual distinctions that Ray attempts to draw are of little or no significance. Ray argues that, unlike the facts we considered in Rowland, he perceived Smith to be intoxicated. But, the district court concluded that the record, viewed in the light most favorable to Smith, demonstrated that Smith did not appear impaired. See Smith, 855 F. Supp. at 580

---

[5] In arguing that the unconstitutionality of his conduct was not clearly established, Ray argues that it was not clearly established that the hair pulling by itself would constitute excessive force. Because the hair pulling was only part of the force Ray utilized here in the course of arresting Smith, we need not consider whether a reasonable officer would have known that the hair pulling, by itself, was excessive.

(rejecting Ray's argument defending the reasonableness of the force employed based on his perceptions of Smith's conduct when "[a]ccepting her version of events as true, she was not intoxicated"); see also id. at 575 ("Smith denies being impaired or otherwise unresponsive").[6]  See also Tolan, 134 S. Ct. at 1866-68; Rogers v. Pendleton, 249 F.3d 279, 292 & n.6 (4th Cir. 2001) (at summary-judgment stage, concluding that district court likely assumed correctness of suspect's testimony that he was unaware of any aspects of his appearance that would have given the impression that he was intoxicated, even though officer testified that suspect appeared intoxicated).  We lack jurisdiction to review this conclusion in the context of this interlocutory appeal.  See Behrens, 516 U.S. at 313.  Moreover, even if Smith had appeared to be intoxicated, it would not change the fact that she was promptly and cogently answering his questions and responding to his requests.  Just as in Rowland, every indication was that there was no justification for a resort to force.

Ray next contends that, unlike in Rowland, the incident in the present case occurred in an area of town with a high

---

[6] Ray testified that when he asked whether T. was in the house, Smith "just stared at [Ray] or stared right through [him]." J.A. 990.  Bullard testified similarly.  But, according to Smith, she "answered . . . Ray's questions clearly, promptly and cogently," "had been awake and alert all day," and "was not intoxicated." J.A. 438.

prevalence of juvenile crime. With regard to the threat that Smith presented, that is hardly a distinction of much significance, particularly considering the compliant demeanor and responsiveness that Smith had displayed up to that point.

Ray also points to the fact that, unlike in Rowland, where there was never any concern that the suspect was armed, Ray became concerned that Smith had a weapon when, during their struggle, she refused to show him her left hand. This concern is of little help to Ray most basically because he did not develop it until he had already thrown Smith to the ground, jammed his knee into her back, and twisted her arm behind her. Moreover, while an officer of course may legitimately be concerned that a suspect is holding a weapon any time the officer cannot see the suspect's hands, Ray offered no reason for actually believing Smith had a weapon other than the fact that she refused to submit to him by giving him her hands. Cf. Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001) (holding officer reasonably believed suspect was armed when, responding to report that man appeared to have a gun under his sweater at a mall, officer observed a bulge under the suspect's clothing on his left side near his waist band; officers approached suspect with guns drawn and demanded that he get on his knees and raise his hands, and the suspect raised his hands but then lowered them without explanation); McLenagan v. Karnes, 27 F.3d 1002,

20

1005, 1007-08 (4th Cir. 1994) (holding that although officer could not see whether arrestee had a gun, officer had probable cause to believe arrestee running at him in a crouched position had a gun when another officer was yelling, "The man has got a gun!"); Slattery v. Rizzo, 939 F.2d 213, 215-16 (4th Cir. 1991) (holding that officer could have reasonably believed he had probable cause to believe that suspect posed a deadly threat as suspect turned toward him; suspect was passenger in car stopped during a sting operation in an open-air drug market where there had been past incidents involving weapons and gun violence; suspect refused officer's repeated requests to show his hands and officer could see that the hand farthest from the officer "appeared to be partially closed around an object"). Ray never saw anything in Smith's hand that looked like a weapon before or during the physical encounter. He saw no suspicious bulge in her clothing or any other indication that she was armed. After he threw her down and jumped on her, Smith repeatedly told Ray that he was crushing her – which we must assume he was – and that she needed to keep her hand under her to be able to breathe. To the extent Ray takes the position that he believed on those facts that she had a weapon, a reasonable jury could have concluded that his perception was unreasonable. See Tolan, 134 S. Ct. at 1866-68. Further, Ray cannot artificially "segment" his use of force and defeat her excessive force claim

by using Smith's simple refusal to submit to his unexplained and violent assault to justify his escalation of the violence. See Rowland, 41 F.3d at 173.

Ray also relies on Smith's "admission" that she was attempting to "avoid[] [Ray] at all costs." J.A. 439. However, that "admission" in her affidavit is of no help to Ray at this stage of the litigation. The context of her statement was her contention that when he initially grabbed her, "[a]lthough I pulled my arm away, I did not run," but rather, "stayed and questioned my arrest." J.A. 439. She maintained that "Ray simply ignored me and tried again to grab me" and she "tried avoiding him at all costs." J.A. 439. A fact finder could reasonably conclude that Smith's statement that she was trying to avoid Ray at all costs referred only to her pulling her arm away when he grabbed her and did not indicate she engaged in any other evasive behavior.

Ray also argues that he was justifiably concerned that Smith could possibly run toward the road and be hit by a car if he did not immediately physically seize her, but that is not much of a factor here either. Ray's claimed concern was based on the premise that Smith appeared to be impaired, which, as we have explained, we cannot accept for purposes of this interlocutory appeal. And even if she had appeared to be intoxicated, she had not indicated any inclination to flee the

22

scene, even after Ray started to grab her. Just as in <u>Rowland</u>, where the suspect was standing on a street corner at the time force was employed, it was of course <u>possible</u> that the suspect could take off running into traffic if the officer took a moment to explain why he was authorized to detain the suspect. However, on the facts before us at this stage, there was no reason for Ray to expect that the previously compliant suspect would suddenly take that course.[7]

As in <u>Rowland</u>, the weakness of the <u>Graham</u> factors was so apparent that any reasonable officer would have realized that the force employed was excessive. Accordingly, the district court correctly denied Ray's motion for summary judgment.

We certainly note, however, that our conclusion that Ray is not entitled to qualified immunity at this stage is no indictment of Ray, who denies many of the facts on which Smith's claim is based. Most significantly, he contends that he <u>did</u> clearly explain why he needed to detain Smith, that she responded by physically attacking him, and that he did not pull

---

[7] Ray contends that an unpublished district court opinion, <u>Dunn v. Vanmeter</u>, 2010 WL 3154972 (W.D. Va. Aug. 9, 2010), could have led a reasonable officer to believe that Ray's actions did not constitute excessive force. However, the facts of <u>Dunn</u> were entirely different from those before us, most basically because the physical confrontation in that case occurred after the officer informed the suspect that he was arresting him pursuant to a warrant and the suspect turned away from the officer and began walking into the carport of his house. <u>See</u> <u>id.</u> at *1.

23

her hair.  However, as the district court recognized, it is the jury's role, not ours, to decide whose version of facts is correct.[8]

## III.

In sum, finding no error, we affirm the district court's order denying Ray's summary judgment motion.

AFFIRMED

---

[8] Ray also points to a number of cases in which some of the actions that Ray took here were found not to constitute excessive force.  In most of these cases, the officer resorted to force only when a suspect refused to comply with the officer's requests.  See Sullivan v. City of Pembroke Pines, 2006 WL 63959, 161 Fed. App'x 906 (11th Cir. 2006) (per curiam) (suspect and officer had a loud and angry exchange and suspect approached officer, ignoring his multiple requests for her to get back into her van); Lee v. Hefner, 2005 WL 1385930, 136 Fed. App'x 807 (6th Cir. 2005) (suspect continued running in an alley after officer asked suspect to talk to him); Karadi v. Jenkins, 2001 WL 320893, 7 Fed. App'x 185 (4th Cir. 2001) (per curiam) (angry shoplifting suspect refused officer's request to accompany him to the store's security office).  In another, the court merely held that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."  Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002).  Of course, we do not hold that the level of force Ray employed here was per se unconstitutional in all circumstances.  Rather, we merely hold that any reasonable officer would have known that, on the particular facts of this case, Ray's actions constituted excessive force.