UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1555**

BRIAN KNITE YATES,

Plaintiff - Appellee,

v.

CHRISTOPHER BLAIR TERRY,

Defendant - Appellant,

and

JON R. ZUMALT; CITY OF NORTH CHARLESTON; NORTH CHARLESTON
POLICE DEPARTMENT; JOHN DOE DEFENDANTS,

Defendants.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  C. Weston Houck, Senior District
Judge.  (2:11-cv-02289-CWH)

Argued:  January 27, 2016          Decided:  March 31, 2016

Before WYNN and HARRIS, Circuit Judges, and Loretta C. BIGGS,
United States District Judge for the Middle District of North
Carolina, sitting by designation.

Affirmed by published opinion.  Judge Biggs wrote the opinion, in
which Judge Wynn and Judge Harris joined.

**ARGUED**: Robin Lilley Jackson, SENN LEGAL, LLC, Charleston, South
Carolina, for Appellant. Jason Scott Luck, SEIBELS LAW FIRM, P.A.,

Charleston, South Carolina, for Appellee. **ON BRIEF**: Gordon H. Garrett, GARRETT LAW OFFICES, North Charleston, South Carolina, for Appellee.

———————

LORETTA COPELAND BIGGS, District Judge:

Officer Christopher Blair Terry ("Terry") appeals the district court's order denying his motion for summary judgment on the basis of qualified immunity. For the reasons that follow, we affirm.

I.

In reviewing the district court's denial of Terry's motion for summary judgment, we view the facts in the light most favorable to Brian Yates ("Yates"), the non-moving party, as we are required to do. See Plumhoff v. Rickard, 134 S. Ct. 2012, 2017 (2014); Waterman v. Batton, 393 F.3d 471, 473 (4th Cir. 2005).

On December 27, 2008, Yates, a first sergeant and Iraq War veteran, was driving a 1972 customized Buick Skylark on a highway in North Charleston, South Carolina. His mother, Patricia Yates, and brother, Kelvin Brown, were in a separate vehicle following behind him. Yates drove past two police cruisers when one of the cruisers, driven by Terry, pulled out and began to follow him. At some point, Terry activated his lights; however, there was a vehicle between Terry and Yates, which led Yates to believe that the officer was attempting to stop another vehicle. Yates then changed lanes, using his turn signal, to allow Terry to pass. When Yates realized that Terry was behind him, Yates pulled over at a gas station. At the gas station, Terry approached Yates' vehicle and requested Yates' driver's license. Yates responded that he

3

did not have his driver's license but that he did have military identification. Terry then opened the car's door and forced Yates out of the car. Around this time, Yates' mother and brother arrived at the gas station. Terry ordered Yates to place his hands on the car. Yates complied. Terry informed Yates that he was under arrest, which prompted Yates to inquire as to the basis for the arrest. Terry failed to provide an explanation. With Yates' hands on top of the car and Terry behind him, Yates turned his head to the left and Terry deployed his taser in "probe mode."[1] Yates fell to the ground. Yates' brother then asked Terry why he tased Yates, and Terry responded, "Back up[,] or do you want some too[?]" J.A. 23, 68–69, 82, 479-80. While Yates was still on the ground and having made no attempt to get up, Terry tased him a second time. Following the second application of the taser, Yates told his brother to call his commanding officer and then reached for his cell phone, which was clipped to his waist, when Terry tased Yates a third time. Yates' mother passed out after the third taser deployment.

---

[1] Generally, a taser has two modes: "probe" or "dart" mode and "drive stun" mode. See Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 897 n.3 (4th Cir. 2016); Meyers v. Baltimore Cty., 713 F.3d 723, 728 n.3 (4th Cir. 2013). "In probe mode, two probes are fired from a distance, attached to thin electrical wires, to lodge in the skin of the subject." Meyers, 713 F.3d at 728 n.3. The taser delivers a five-second cycle of electricity designed to override the central nervous system, disabling the subject. Estate of Armstrong, 810 F.3d at 897 n.3; Meyers, 713 F.3d at 728 n.3.

4

Following these events, other officers arrived on the scene and Yates was placed into handcuffs. EMS also arrived and provided medical care to Patricia Yates. The officers searched Yates' vehicle. Yates was charged with an excessive noise violation, no license in possession, and disorderly conduct, all of which were nol prossed.

## II.

On July 21, 2011, Yates filed this action in state court, alleging multiple state claims and federal claims against Defendants Terry, the City of North Charleston, the North Charleston Police Department, Chief Jon R. Zumalt, and unnamed John Does. The suit was removed to federal court and was stayed while Yates was deployed to Germany and Kosovo. On May 30, 2014, Defendants moved for summary judgment. The district court granted the motion in part, dismissing Chief Jon R. Zumalt, the North Charleston Police Department, Terry in his official capacity, the John Doe Defendants, and various federal and state claims. However, the court denied the motion with respect to the excessive force claim against Terry in his individual capacity and various state claims against the City of North Charleston. Defendants subsequently filed a motion for reconsideration, which the district court granted in part and denied in part, dismissing the City of North Charleston from the lawsuit. On April 28, 2015, the parties filed a stipulation of dismissal as to all claims except

5

for the 42 U.S.C. § 1983 claim for excessive force against Terry in his individual capacity.  This appeal followed.

III.

A.

As an initial matter, though not raised by either party, we must address whether we have jurisdiction over this interlocutory appeal.  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to 'satisfy itself . . . of its own jurisdiction . . . .'" (quoting Mitchell v. Maurer, 293 U.S. 237, 244 (1934))).  Generally, a district court's order denying summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine.  See Mitchell v. Forsyth, 472 U.S. 511, 528–30 (1985).  However, when a district court denies a claim of qualified immunity based on the insufficiency of the facts then that determination is not immediately appealable.[2]  See Johnson v. Jones, 515 U.S. 304, 319-20 (1995); Winfield v. Bass, 106 F.3d 525, 529 (4th Cir. 1997).  Our jurisdiction over such an appeal extends only to a denial of qualified immunity *to the extent that it turns on an issue of law.*"  Iko v. Shreve, 535 F.3d 225, 234

---

[2] Where "a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005).

6

(4th Cir. 2008) (quoting Mitchell, 472 U.S. at 530). Because in this case the district court determined at least one of the taser applications to which Yates was subjected required further factual development, we must examine whether we have jurisdiction over Yates' excessive force claim under 42 U.S.C. § 1983.

During the February 26, 2015 hearing on Terry's motion for summary judgment, the district court explained that Terry was not entitled to qualified immunity with respect to the first two taser applications. See J.A. at 557-58 ("The first two occasions, it seems to me, are clear that qualified immunity does not apply. I think that they constituted unreasonable force and a constitutional violation, and I think that it was well known that that was a violation."). The court then proceeded to address the third taser application, stating:

> The third one is a little more problematic. And I frankly feel that it's going to depend largely upon a greater focus on the facts of the case than we now can make. . . . But I do think that the third taser shot needs closer scrutiny. And timing is such an important factor in that case. When did the officer speak to the [plaintiff][?] . . . [W]hen did the plaintiff start to grab the cell phone out of his waistband and throw it to his brother? The facts are just not developed to the extent that I can make a decision there.

Id. at 558. The court held that "as to all three uses of the taser, . . . qualified immunity does not apply, and that the defendant Terry is not entitled to summary judgment on that constitutional claim." Id. The court then entered an order

7

denying Terry's motion for summary judgment on his § 1983 claim, stating that "[t]his Order hereby memorializes that which was set forth on the record [at the February 26 hearing]." Id. at 565. Further, in an order on a motion for reconsideration filed by Terry, the district court stated that it denied Terry's motion for summary judgment on his § 1983 claim, "concluding that the facts were not sufficiently developed to support the granting of summary judgment." Id. at 569. Later in the same order, the court stated that it "carefully conducted a thorough analysis pursuant to Saucier and determined that Officer Terry's conduct violated a constitutional right which was 'clearly established' at the time of the violation." Id. at 571 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Though the district court used conflicting language in explaining its reasoning for holding that qualified immunity did not apply in this case, it is clear that the court did apply the Saucier analysis to the first two deployments of the taser and concluded "that they constituted unreasonable force and a constitutional violation" which was well established. Id. at 557-58. The court, however, did conclude that further factual development was needed before it could determine whether qualified immunity applied to the third taser deployment. The jurisdictional issue arises partly due to the court's decision to evaluate each use of the taser independently. Yates has raised one excessive

force claim, and we have cautioned courts against using "a segmented view of the sequence of events" where "each distinct act of force becomes reasonable given what [the officer] knew at each point in th[e] progression." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). The better approach in a case such as the one before us is to view the reasonableness of the force "in full context, with an eye toward the proportionality of the force" in light of the totality of the circumstances. Id. We conclude that we have jurisdiction to review the district court's denial of Terry's motion for summary judgment on Yates' excessive force claim.[3]

## B.

A district court's denial of qualified immunity on summary judgment is reviewed de novo, applying the same legal standards as

---

[3] In addition, Terry's arguments on appeal relate to legal issues, not factual ones. See Iko, 535 F.3d at 235 (examining parties' appellate arguments to determine scope of jurisdiction to review district court's denial of qualified immunity at summary judgment). In his briefing, Terry asserts that he is entitled to qualified immunity even under Yates' version of the events. Thus, in evaluating Terry's appeal we are not required to "reweigh the evidence or resolve any disputed material factual issues." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014); see Plumhoff, 134 S. Ct. at 2019 (explaining that questions of whether specific conduct constitutes excessive force in violation of the Fourth Amendment and clearly established law are "legal issues"). Moreover, at oral argument, counsel for Terry represented that the record was fully developed to allow a determination on the merits and that the third use of the taser would go to damages and not liability, assuming that Terry's initial use of his taser was deemed excessive.

the district court did on summary judgment.  See Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In reviewing the district court's denial of summary judgment based on qualified immunity, "we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff."  Waterman, 393 F.3d at 473.  "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff."  Id.  "[T]his usually means adopting . . . the plaintiff's version of the facts."  Iko, 535 F.3d at 230 (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)).

IV.

A.

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person."  Meyers v. Baltimore

10

Cty., 713 F.3d 723, 731 (4th Cir. 2013) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This protection "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

To determine whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry set forth by the Supreme Court in Saucier. The first step is to determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right. Saucier, 533 U.S. at 201. At the second step, courts determine whether that right was clearly established. Id. In this appeal, Terry challenges the district court's conclusion on both steps of the qualified immunity inquiry. We exercise our discretion to conduct the two-step inquiry in the order originally provided by the Supreme Court in Saucier. See Pearson, 555 U.S. at 236 (modifying the Saucier approach such that lower courts may use their discretion to decide the sequence in which to conduct the two steps of qualified immunity analysis). Therefore, our initial inquiry is whether the facts establish a constitutional violation.

11

B.

The Fourth Amendment bars police officers from using excessive force to effectuate a seizure. Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003); see Graham v. Connor, 490 U.S. 386, 395 (1989). Courts evaluate a claim of excessive force based on an "objective reasonableness" standard. Graham, 490 U.S. at 399. The subjective intent or motivation of an officer is irrelevant at this step. Id. at 397. Courts are to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Jones, 325 F.3d at 527 (quoting Graham, 490 U.S. at 396). In doing so, we focus on the facts and circumstances of each case, taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Our inquiry into the reasonableness of the force also requires us to "consider the facts at the moment that the challenged force was employed" "with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015). "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." Id. (quoting Waterman, 393 F.3d at 481). Ultimately, we examine the totality of the circumstances to

12

determine whether the force used was objectively reasonable.  See id.

Viewing the facts in the light most favorable to Yates, we conclude that the factors enunciated in Graham weigh heavily in Yates' favor.  In reaching this conclusion, we find that the first Graham factor, the severity of the crime at issue, strongly favors Yates.  While we accept Yates' position that he committed no traffic violations before being stopped by Terry, even if he had committed the violations alleged by Terry, it is undisputed that these alleged violations are nonviolent, minor traffic infractions.[4]  In addition, the driving without a license offense that was the basis for Terry initially detaining Yates constitutes only a misdemeanor under South Carolina law.[5]  When the offense committed is a minor one, "we have found that the first Graham factor weigh[s] in plaintiff's favor."  Jones, 325 F.3d at 528; see Bryan v. MacPherson, 630 F.3d 805, 828 (9th Cir. 2010) ("Traffic violations generally will not support the use of a significant level of force.").

---

[4] According to Terry, Yates appeared to be speeding, though he used no speed detection device, and was playing loud music in violation of a noise ordinance.  Further, Terry claims that he observed Yates change lanes without a signal light, and cross the double line before he decided to conduct the traffic stop.  Yates denies these allegations.

[5] See S.C. Code Ann. §§ 56-1-190, 56-1-500 (2016).

13

Regarding the second Graham factor, whether Yates posed an immediate threat to the safety of the police or others, we also conclude that this factor favors Yates. The evidence shows that Yates, who was unarmed, complied with Terry's orders to place his hands on the car before Terry tased him for turning his head. After this taser application, Yates fell to the ground where he remained when Terry tased him a second time for no apparent reason.[6] Although Yates reached for his cell phone before being tased a third time, Yates' brother testified that "[t]he officer let [Yates] slide me the phone" and "knew [Yates] was giving me the phone to call [Yates'] commander because he let him do it."[7] J.A. 480. This is not a case where the initial use of force was justifiable because the suspect had a weapon or was acting erratically, and the continued use of such force was unlawful because the threat was eliminated. See, e.g., Meyers, 713 F.3d at 733. In this case, viewing the evidence in the light most favorable to Yates, the evidence does not support an inference that Yates was a danger to Terry at any time during their encounter.

---

[6] According to Terry, he tased Yates because Yates was attempting to get off the ground.

[7] It is unclear from the record whether the district court considered this testimony from Yates' brother. When viewed in the light most favorable to Yates, such testimony would have likely resolved the district court's concern that further factual development was needed on the third deployment of the taser.

14

The third and final Graham factor, whether Yates was actively resisting arrest, also favors Yates. According to Yates, his mother, brother, and unrelated eye witnesses to the incident, Yates was not attempting to flee or resist Terry's efforts to detain him. Further, viewing the evidence in the light most favorable to Yates, he never attempted to get up after he fell to the ground following the first taser application as asserted by Terry. Nor did Terry warn Yates that he would be tased or that he could not move any part of his body. Indeed, Yates asserts that Terry never gave "any commands." J.A. 24; see Casey v. City of Fed. Heights, 509 F.3d 1278, 1285 (10th Cir. 2007) (explaining that a reasonable jury could find that the officer committed a constitutional violation when the officer deployed her taser immediately upon arrival and without warning).

Our analysis of the Graham factors when measured against the level of force used by Terry against Yates leads us to conclude that such force was not objectively reasonable in light of the totality of the circumstances in this case. Terry was ordered out of his car and subsequently tased three times over not having his driver's license. We have explained that "[d]eploying a taser is a serious use of force," that is designed to "inflict[] a painful and frightening blow." Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 902 (4th Cir. 2016) (quoting Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008)). For these reasons, it "may only

15

be deployed when a police officer is confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the taser." Id. at 909. As we held in Estate of Armstrong, "[t]he subject of a seizure does not create such a risk simply because he is doing something that can be characterized as resistance-even when that resistance includes physically preventing an officer's manipulations of his body." Id. The objective facts, when viewed in the light most favorable to Yates, as we must do at this point in the proceedings, show that he was neither a dangerous felon, a flight risk, nor an immediate threat to Terry or anyone else. Yates has thus established that Terry's use of his taser constituted excessive force in violation of Yates' Fourth Amendment rights.[8]

---

[8] Terry's reliance on our unpublished decision in Gray v. Board of County Commissioners of Frederick County, 551 F. App'x 666 (4th Cir. 2014), is misplaced for several reasons. Contrary to Terry's argument, the procedural posture and facts of that case are remarkably different from this case. First, at the summary judgment stage, the district court in that case, in viewing the evidence in the light most favorable to the plaintiffs, denied the officer's motion on the excessive force claim and that claim proceeded to trial. See id. at 671 & n.5; Gray v. Torres, No. WDQ–08–1380, 2009 WL 2169044, at *4 (D. Md. July 17, 2009). Later, the jury decided that the facts did not establish a constitutional violation by the officer's use of his taser. Gray, 551 F. App'x at 671. Perhaps the most important distinction, however, was that the evidence before the jury was significantly different from the evidence now before us in this case. The officer there responded, unaccompanied, to a report that people were in the street fighting. Id. at 669. When the officer arrived on the scene, the decedent used profane language and refused to comply with the officer's orders to get down on the ground. Id. at 670. The decedent placed his hands inside his pockets in front of his waistband, and the

16

C.

Having concluded that Yates' constitutional rights were violated, we must determine whether those rights were clearly established at the time of Terry's conduct. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he [wa]s doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)). Ordinarily, to answer this inquiry, we "need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose" to determine whether a reasonable officer would know that his conduct was unlawful in the situation he confronted. Wilson v. Kittoe, 337 F.3d 392, 402-03 (4th Cir. 2003) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999)). An official violates a "clearly established" constitutional right when, "'in the light of preexisting law[,] the unlawfulness' of the actions

officer observed a bulge where his hands were located. Id. However, the officer did not fire his taser immediately. See id. Rather, the officer repeatedly warned the decedent to let him see his hands, but the decedent refused to comply. Id. After these repeated warnings, the officer deployed his taser. Id. When the decedent was on the ground, the officer again ordered the decedent to show his hands, which were beneath his body at that point, but the decedent did not comply. Id. The officer then tased him a second time, not knowing that the decedent needed medical attention. Id. The decedent died. Id. On appeal, we affirmed the district court's judgment based on the jury verdict that was in favor of the officer. Id. at 677.

17

is apparent." Iko, 535 F.3d at 237-38 (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). However, a right need not be "recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity." Meyers, 713 F.3d at 734; see Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (explaining that "existing precedent must have placed the statutory or constitutional question beyond debate").

In this case, it was clearly established in 2008 that a police officer was not entitled to use unnecessary, gratuitous, or disproportionate force by repeatedly tasing a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing. See Meyers, 713 F.3d at 734-35; Jones 325 F.3d at 532-34; Bailey v. Kennedy, 349 F.3d 731, 745 (4th Cir. 2003); Rowland, 41 F.3d at 174; see also Parker v. Gerrish, 547 F.3d 1, 9-11 (1st Cir. 2008); Casey, 509 F.3d at 1282, 1284-86. Although our decisions in Meyers, Bailey, and Jones dealt with individuals who were secured when they were subjected to excessive force, our precedent nonetheless provided Terry with fair notice that the force he used against Yates under the facts of this case was unconstitutionally excessive.

In Meyers, we held that an officer's first three uses of his taser did not amount to excessive force because the suspect was

18

actively resisting arrest and posed a threat to the officer's safety. 713 F.3d at 733. After the first three taser uses, the suspect fell to the ground, was no longer armed, and was secured by several officers who sat on his back. Id. However, the suspect was then subjected to seven additional taser applications. Id. We found the seven additional deployments of the taser to be unnecessary, gratuitous, and disproportionate. Id. at 735. In reaching our holding in Meyers, we relied primarily on our decisions in Bailey and Jones, both of which were decided in 2003. In Bailey and Jones, we denied qualified immunity to officers who used excessive force against individuals who had not committed any crimes, were secured in handcuffs, and posed no threat to the officers or others. Bailey, 349 F.3d at 745; Jones, 325 F.3d at 534. Even in a case that we decided in 1994, where an individual committed a minor crime, and there was some evidence of resistance, we denied qualified immunity to an officer who "used a wrestling maneuver, throwing his weight against [the suspect's] right leg and wrenching the knee until it cracked." Rowland, 41 F.3d at 172, 174. In denying the officer immunity, we explained that the suspect was neither armed nor a danger to the officer or others. Id. at 174.

Even though Yates was not handcuffed, our precedent makes clear that a nonviolent misdemeanant who is compliant, is not actively resisting arrest, and poses no threat to the safety of

19

the officer or others should not be subjected to "unnecessary, gratuitous, and disproportionate force." Meyers, 713 F.3d at 735. Viewing the facts in the light most favorable to Yates, no reasonable officer would have believed that Terry's use of the taser was justifiable at all and certainly not on three occasions. We reject Terry's argument that the unlawfulness of his conduct was not clearly established because he was faced with a dual-sided threat. Drawing reasonable inferences in Yates' favor, there was no threat to safety, dual-sided or otherwise. Rather, there was a commotion attributable to Terry's excessive and unjustifiable use of force, which unnecessarily escalated tension during what can at best be described as a routine traffic stop. See Smith, 781 F.3d at 103 ("Not only did [the officer's] violent response subject [the arrestee] to an obvious risk of immediate injury, it also created the very real possibility that . . . the attack would continue to meet with frightened resistance, leading to an even further escalation of the violence."); id. at 104 ("[O]ur determination . . . in Rowland . . . was based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself.").

V.

For the foregoing reasons, we conclude that based on the totality of the circumstances and viewing the evidence in the light most favorable to the non-moving party, Terry is not entitled to qualified immunity as a matter of law. We therefore affirm the district court's denial of Terry's motion for summary judgment based on qualified immunity.

AFFIRMED