UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2468**

ANGELLO A. D. OSBORNE,

             Plaintiff - Appellee,

      v.

PETER GEORGIADES, Police Corporal,

             Defendant – Appellant,

      and

DIONE WHITE, LGSW; MEREDITH LYNN PIPITONE,

             Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Richard D. Bennett, District Judge.
(1:14-cv-00182-RDB)

Argued:  May 10, 2016          Decided: February 8, 2017

Before GREGORY, Chief Judge, TRAXLER, Circuit Judge, and Joseph
F. ANDERSON, Jr., Senior United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by unpublished opinion.  Chief Judge Gregory wrote the
opinion, in which Judge Anderson joined.  Judge Traxler wrote a
dissenting opinion.

**ARGUED**:  Deborah Street Duvall, HARFORD COUNTY DEPARTMENT OF
LAW, Bel Air, Maryland, for Appellant.  Robert Louis Smith, Jr.,
LAW OFFICE OF ROBERT L. SMITH, JR., Baltimore, Maryland,

for Appellee.   **ON BRIEF**:   Melissa Lambert, County Attorney, Kristin L. Lewis Noon, Assistant County Attorney, HARFORD COUNTY DEPARTMENT OF LAW, Bel Air, Maryland, for Appellant.

————————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

Plaintiff-appellee Angelo Osborne sued Defendant-appellant Corporal Peter Georgiades, as well as Dione White and Meredith Lynn Pipitone, alleging violations of his constitutional rights under 42 U.S.C. §§ 1983 and 1985. Specifically, Osborne contends that Georgiades, in the process of investigating him for alleged sexual abuse of his minor child, unreasonably seized him in violation of the Fourth and Fourteenth Amendments. Georgiades moved for summary judgment on grounds of qualified immunity. The district court denied the motion, holding that Georgiades is not entitled to qualified immunity. For the reasons stated below, we affirm the judgment of the district court.

I.

A.

As a preliminary matter, we view the facts in the light most favorable to Osborne, the nonmoving party. See ACLU of Md., Inc. v. Wicomico County, 999 F.2d 780, 784 (4th Cir. 1993). Osborne and Pipitone are the parents of two minor children—a daughter ("JMLO"), five years old at the time of the events in question, and a son ("CJP"), then two years old. On November 1, 2010, Pipitone contacted the Harford County Child Advocacy Center to report the alleged sexual assault of JMLO. Pipitone

3

claimed that JMLO did not want to spend Halloween with her father. JMLO purportedly told Pipitone that a few weeks prior, Osborne had ████████████████████████████████ ██████ Sealed App. 63.*

Later that day, White, a licensed social worker for the Harford County Child Advocacy Center, interviewed Pipitone. After speaking with Pipitone, White interviewed JMLO. Although Georgiades was not present, he remained in telephone contact with White and observed the interview from a nearby room via live video feed for purposes of investigating the allegations. White employed the Rapport, Anatomical Identification, Touch Inquiry, Abuse Scenario, Closure ("RATAC") method when questioning JMLO. RATAC focuses on reducing any potential trauma to the child during the interview.

In her initial responses to White's questions, JMLO consistently denied that Osborne, or anyone else, had touched her on parts of her body covered by a bathing suit. ██████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ Id. In

_____

*The Court will cite to the audio and video recording of JMLO's interview because the transcript, Sealed App. 36-56, contains numerous errors.

4

total, JMLO denied abuse six times.  <u>See</u> J.A. 250, 252, 255 (classifying JMLO's responses as "denials").



<u>Id.</u>  After approximately three minutes of similar questions, JMLO changed course and finally replied, "He did." <u>Id.</u>

JMLO went on to state ██████████████████████ <u>Id.</u> ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████ <u>Id.</u>

JMLO also described ████████████████████████

███████████████████████████ █ ██████████

███████████████████████████████████████

She then referred to an incident at Osborne's house in which CJP got in "trouble" with Osborne's girlfriend. <u>Id.</u> Although it is not entirely clear what CJP did, JMLO stated "that's why I'm never going over there again." <u>Id.</u> White never asked any follow-up questions concerning that incident.

5

Instead, White asked several questions regarding whether Osborne's girlfriend and CJP "saw it happen." Id. JMLO again changed course and stated that Osborne's girlfriend was not present when the alleged abuse occurred and that CJP was asleep. Id.

After JMLO described and demonstrated with dolls the alleged acts of abuse, White placed a phone call to Georgiades, who suggested other topics to discuss. J.A. 226, 237. After this call, she asked JMLO whether CJP was present during the second instance of abuse. JMLO stated that CJP was asleep in the bed next to her. Id. at 54. JMLO also stated Osborne ██████████████████████████████████████████████ Id. at 55. White then asked ████████████████████ ██████████████████████████████ Id.

Their conversation was then interrupted by a second phone call from Georgiades. After this conversation, White asked JMLO a series of questions regarding ██████████████ ████████████████ ████████████████████████ ███████████████████████████████████████████████ ██████████████ At this point, Georgiades immediately placed a third phone call, resulting in White terminating the interview. White and Georgiades spoke on three occasions throughout the interview.

6

After White completed the interview, Pipitone called Osborne to accuse him of sexually assaulting their daughter. With Pipitone's consent, Georgiades listened in on the call. During that conversation, Osborne consistently denied Pipitone's accusations. Osborne also told Pipitone he would take a polygraph test if she took one. J.A. 318, 319-20.

The most recent assault allegedly occurred on October 16, 2010. Dr. Paul Lomonico conducted a thorough physical exam of JMLO on November 3, 2010, for evidence of sexual assault. He examined her entire body, ████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████ Sealed App. 58. His medical report indicated "no physical signs . . . of sexual abuse" but noted, "This does not rule out abuse." Id.

On December 15, 2010, Georgiades met with Diane Tobin ("Tobin"), a Deputy State's Attorney for Harford County, Maryland. After reviewing the video of the JMLO interview, Tobin accepted the case for prosecution. For over a month, Georgiades attempted to contact Osborne, but was unsuccessful. On January 21, 2011, Georgiades spoke to Osborne, who stated that he would only speak with Georgiades with his attorney present. Id. at 68.

On January 24, 2011, Georgiades applied for an arrest warrant. Georgiades's affidavit disclosed only JMLO's accusations of sexual abuse but not her repeated denials, nor the results of the medical examination. An arrest warrant was issued, and Osborne was arrested on the same day. Osborne was charged with eight counts of sexual—assault-based offenses. On January 25, 2011, Osborne was detained in the Harford County Detention Center, with bail set for $500,000. A grand jury subsequently indicted Osborne on February 15, 2011, on sixteen counts of sexual-assault-related crimes. Osborne was incarcerated without bond for over eight months, until October 3, 2011, when a bond was set for $25,000. The state eventually declined to prosecute Osborne on December 13, 2011, instead placing his case on the inactive "stet" docket.

B.

Osborne initiated the present action on January 23, 2014. Osborne claims that White, with Georgiades's guidance, fabricated evidence against him by asking JMLO "unduly suggestive and leading" questions "designed and intended to cajole the minor child into making up a story to support" Pipitone's accusations. J.A. 9. Osborne also claims that Georgiades knowingly omitted relevant facts from his application for Osborne's arrest warrant. Osborne denies ever assaulting or even attempting to assault the minor child. He argues that his

8

arrest and ensuing incarceration were "without justification, without probable cause, and were motivated by [Defendants'] wanton, malicious[,] and reckless desire to inflict great emotional and physical distress and pain and suffering upon" him. Id. at 11.

After the district court dismissed all claims against White and Pipitone, Georgiades moved for summary judgment on the sole remaining claim that he violated Osborne's Fourth Amendment right against unreasonable seizure under 42 U.S.C. § 1983. Georgiades argued that he is entitled to qualified immunity for his actions. The district court concluded that Georgiades is not entitled to immunity for the acts underlying Osborne's § 1983 claim—fabrication of evidence and omission of material facts from the warrant application. First, the court held that because the contents of the conversations between White and Georgiades were not "disclosed," a reasonable jury could conclude that Georgiades exerted pressure that resulted in the fabrication of evidence against Osborne. J.A. at 331. Second, the court found that a reasonable jury could conclude that Georgiades's warrant application contained omissions made deliberately or with reckless disregard for any misleading effect and that the omitted evidence had the potential to negate probable cause. Id. at 333. This appeal timely followed.

9

## II.

We review an award of summary judgment on the basis of qualified immunity de novo. Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012). In reviewing the district court's denial of summary judgment based on qualified immunity, "we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff." Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016) (citation omitted). "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." Id. (citation omitted). "[T]his usually means adopting . . . the plaintiff's version of the facts." Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)).

## III.

Qualified immunity shields government officials from liability in a § 1983 suit unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, we ask (1) whether the facts

10

illustrate that the official violated the plaintiff's constitutional right; and (2) whether the right was clearly established law at the time of the alleged event such that "a reasonable officer would have understood that his conduct violated the asserted right." Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007) (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001)). The answer to both questions must be in the affirmative to defeat the official's motion for summary judgment on qualified immunity grounds. Id.

## A.

First, we consider whether the facts demonstrate that Georgiades violated Osborne's asserted constitutional right. Osborne maintains that the facts outlined above, considered in the light most favorable to him, allege a claim that he was seized without probable cause in violation of the Fourth Amendment. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996). Osborne specifically contends that his seizure was unreasonable because it resulted from (1) Georgiades's fabrication of evidence and (2) the omission of material facts from the warrant application.

11

1.

Osborne alleges that Georgiades fabricated evidence by directing White to ask JMLO misleading questions, thereby resulting in JMLO's false account of sexual abuse. The district court held that a reasonable jury could conclude that Georgiades committed a constitutional violation by exerting pressure that caused the fabrication of evidence against Osborne and directly resulted in his unreasonable seizure. J.A. 331. The district court further held that the right to be free from deprivation of liberty due to an officer's fabrication of evidence was clearly established at the time of Georgiades's alleged conduct. J.A. 332. As such, the district concluded that Georgiades was not entitled to qualified immunity for the alleged fabrication.

Georgiades has waived his challenges to these holdings by raising them for the first time in his reply brief. See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, 722 F.3d 591, 602 n.13 (4th Cir. 2013) (stating that appellant's failure to address issue in opening brief will deem issue waived or abandoned). Therefore, Georgiades's challenges are not properly before us, and we will not address the district court's holdings on the fabrication claim.

2.

Osborne, arrested pursuant to a warrant, also contends that Georgiades unlawfully omitted certain key facts from the warrant

12

application. Relying on the two-prong standard set forth in Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (requiring intent and materiality), the district court held that Osborne must show that Georgiades "deliberately or with reckless disregard for the truth made material false statements in his affidavit, . . . or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." J.A. 332 (quoting Miller, 475 F.3d at 627).

Below, we consider the district court's holdings as to the intent and materiality prongs to determine whether Georgiades's omissions amount to a constitutional violation.

a.

Initially, we conclude that Georgiades has waived any challenge to the district court's holding regarding his intent to mislead. The district court held that a reasonable jury could conclude that Georgiades's warrant application contained omissions made deliberately or with reckless disregard for any misleading effect. J.A. 332. Georgiades only makes a passing reference to the district court's holding, contending in a footnote that "Osborne has failed to demonstrate that the omissions were made with reckless disregard for the truth. . . . However, the Court need not reach this issue since probable cause existed for the warrant against Osborne." Appellant's Br.

13

15 n.4. Georgiades makes no attempt to explain the basis for his belief, nor does he present any argument on why summary judgment should have been granted in his favor on this issue. The issue is therefore waived. See, e.g., Belk, Inc. v. Meyer Corp., 679 F.3d 146, 152 n.4 (4th Cir. 2012) (concluding that defendant waived issue for failure to develop argument in brief).

b.

Next, we consider the district court's holding regarding the materiality of the omitted facts. Id. at 333. Georgiades argues that the district court erred by concluding that the omitted facts "could" and "had the potential" to negate a finding of probable cause. J.A. 333. We agree that the district court employed the wrong standard, but the error was harmless because the omissions met the proper standard under Franks.

The correct materiality standard under Franks requires that the omissions be necessary to the neutral and disinterested magistrate's finding of probable cause. Evans v. Chalmers, 703 F.3d 636, 650 (4th Cir. 2012) (quoting Miller, 475 F.3d at 628). The omission "must be such that its inclusion in the affidavit would defeat probable cause for arrest." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990). The court must insert the facts recklessly omitted and determine whether or not

14

the "corrected" warrant affidavit would establish probable cause. Miller, 475 F.3d at 628. If the "corrected" warrant affidavit establishes probable cause, the omissions do not amount to a constitutional violation. Id.

Probable cause for an arrest "exists where the facts and circumstances within [the officer's] knowledge and of which [he or she] had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested." Clipper v. Takoma Park, Md., 876 F.2d 17, 19 (4th Cir. 1989) (citing Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979)).

Osborne contends that a "corrected" affidavit would not have established probable cause for his arrest. As corrected, Georgiades's warrant application would have shown that (1) JMLO repeatedly denied (six times in total) that she was sexually abused by Osborne; (2) she then stated, and demonstrated by using dolls, ██████████████████████████████ ████ ████ ██████ █ ████ ██████████ ██ ██ ███████████████████████████████████ ████ ; (3) the most recent acts of abuse occurred on October 16, 2010; and (4) a thorough medical exam conducted on November 3, 2010 revealed no physical signs of sexual abuse. Considering the totality of the circumstances presented by this information,

15

the "corrected" warrant application would not have established probable cause to arrest Osborne.

The facts and circumstances presented by the "corrected" warrant application are not sufficient in themselves to warrant a person of reasonable caution in the belief that Osborne committed the offense stated in the application. The corrected warrant application would have asked the magistrate to issue a warrant for Osborne's arrest in spite of JMLO's inconsistent allegations of abuse and direct evidence that may contradict that any abuse occurred-Dr. Lomonico's medical examination and report. ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ As such, the omitted facts are material because their inclusion would have defeated probable cause.

## B.

Georgiades has never contended that the right asserted by Osborne was not clearly established. For the reasons stated above, this issue is undoubtedly waived. And even if not waived, this contention is without merit.

The Fourth Amendment right to be arrested only on probable cause was clearly established at the time of the events at issue here. Miller, 475 F.3d at 632; Brooks, 85 F.3d at 183. More specifically, it was also clearly established "that the

16

Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make . . . omissions to seek a warrant that would otherwise be without probable cause." Miller, 475 F.3d at 631-32 (collecting cases). The objective standard for qualified immunity accommodates the allegation of material omissions "because a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by [omitted facts] that the officer knows or should know [would negate probable cause]." Smith, 1010 F.3d at 355.

We therefore conclude that Georgiades is not entitled to qualified immunity.

IV.

Georgiades also argues that the February 15, 2011, grand jury indictment "conclusively determined the existence of probable cause, which unless rebutted by Osborne, nullifies Osborne's claims of false arrest and false imprisonment." Appellant's Br. 9. Georgiades, however, failed to raise this argument in the district court.

This Court has repeatedly held that issues raised for the first time on appeal generally will not be considered. Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (collecting cases). "The matter of what questions may be taken up and

17

resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." In re Under Seal, 749 F.3d 276, 285 (4th Cir. 2014) (quoting Singleton v. Wulff, 428 U.S. 106, 121 (1976)). In this circuit, we exercise that discretion sparingly. Exceptions to this general rule are made only in very limited circumstances, such as when the newly raised argument establishes "fundamental error" or a denial of fundamental justice. Stewart v. Hall, 770 F.2d 1267, 1271 (4th Cir. 1985). The error must be "so serious and flagrant that it goes to the very integrity of the trial." Id.

Because fundamental error is a more limited standard than the plain-error standard applied in criminal cases, we use the plain-error standard "as something of an intermediate step in a civil case." In re Under Seal, 749 F.3d at 285-86. If a party in a civil case fails to meet the plain-error standard, it is clear that he also fails to establish fundamental error. Id.

Under the plain-error standard, we may correct an error not raised before the district court only where the appellant demonstrates: (1) there is in fact an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, meaning it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness,

18

integrity, or public reputation of judicial proceedings.  United States v. Marcus, 560 U.S. 258, 262 (2010).  We have refused, however, to conduct plain error review where the party "failed to make its most essential argument in its briefs or at oral argument:  . . . that the district court fundamentally or even plainly erred."  In re Under Seal, 749 F.3d at 292.

Here, Georgiades has not made his most essential argument. His "failure to argue for plain error and its application on appeal surely marks the end of the road for [his] argument for reversal not first presented to the district court."  Id.  Thus, Georgiades's argument is waived.

V.

For the foregoing reasons, the district court's denial of Georgiades's summary judgment motion is

AFFIRMED.

TRAXLER, Circuit Judge, dissenting:

We are talking about a five year old little girl. She described how her father sexually molested her to a trained and experienced forensic interviewer, using anatomically correct drawings and dolls to demonstrate what he did to her. The majority holds it was illegal to arrest the father.

The little girl initially denied being abused during the interview and a medical examination conducted over two weeks after the abuse showed no signs of physical injury. Notwithstanding the fact that a trained and experienced social worker and interviewer, with full knowledge of the two additional facts, determined that sexual abuse was indicated under Maryland law, the majority holds there can be no arrest because there was no probable cause. If this were a published case which would set precedent for this circuit, you could say goodbye to the prosecution of many child sexual abuse cases, because those two facts are common to sexual abuse cases involving children.

This little girl is like most five year olds who have been sexually abused. She does not want to talk about it. The video of her forensic interview makes that plain. There are many reasons why this occurs and why children, more often than not, initially deny sexual abuse, particularly abuse by a parent or other trusted adult. The child may have been

20

threatened not to talk by her abuser. She may have been told not to tell (as was the case with this little girl) or led into a promise to "keep our secret." She may be simply embarrassed. A child's reluctance to talk about sexual abuse happens all the time. But such initial denials do not mean the abuse did not occur and they cannot be accepted at face value. More questions must be asked and different interview approaches must be explored. It takes a trained and skilled interviewer to get past these initial denials to uncover the truth of what happened in a reliable way. That is precisely what happened here.

Likewise, the absence of physical trauma is not unusual, because there are degrees of sexual abuse. A lack of injury does not mean no sexual abuse occurred. This child told the interviewer ██████████████████████████████████ S.J.A. 46. The particular incident caused pain to her but not physical injury. Hence the validity of the examining doctor's conclusion that the absence of physical trauma did not mean that no sexual abuse occurred.

According to the majority's holding in this case, if a small child initially and briefly denies sexual abuse and the medical examination shows no injury, but is otherwise inconclusive, then there is no probable cause to arrest the abuser. Yet, in Maryland, a sex offender can be convicted at trial solely on the testimony of his young victim. There is no

21

requirement of corroboration, and initial denials by the child do not affect the admissibility of her testimony about what happened. It is for the jury to decide whether the child's statement is enough, or whether the initial denials render her testimony unreliable. The majority is requiring more evidence for an arrest than Maryland requires for a conviction.

## I.

### A.

Under Maryland's child abuse and neglect statute, local social services departments are charged, along with law enforcement, with investigating allegations of child abuse. See Md. Code Fam. Law § 5-706. At the conclusion of an investigation, the department must determine whether child abuse is "indicated," "ruled out," or "unsubstantiated." See Md. Code Regs. § 07.02.07.12.

On November 1, 2010, Meredith Pipitone reported to the Harford County Child Advocacy Center that her 5 year-old daughter, "JMLO," had been sexually abused by Osborne, JMLO's father. Later that day, Pipitone brought JMLO to the child advocacy center and talked to Dion White, a licensed social worker and trained forensic interviewer in child sexual abuse cases.

In accordance with Maryland law, White immediately conducted a forensic interview of JMLO. White's interview

22

followed the RATAC method. See Jennifer Anderson et al, The Cornerhouse Forensic Interview Protocol: RATAC, 12 T.M. Cooley J. of Prac. & Clinical L. 193, 202 (2010). RATAC, an acronym for "Rapport, Anatomy Identification, Touch Inquiry, Abuse Scenario, and Closure," see id., is a well-recognized and widely-accepted model for interviewing and questioning children about sexual abuse. A trained interviewer generally goes through the steps sequentially and begins by establishing a rapport and gaining the child's trust. The interviewer then utilizes anatomical drawings "to identify different parts of the body, to develop a common language," for the child to use in identifying body parts. J.A. 210. She then moves to the Touch Inquiry, wherein the child is asked about "what parts of the body may not be okay for someone to touch." J.A. 211. Finally, the interviewer delves into whether the allegations of abuse have occurred – the "Abuse Scenario" – and ultimately reaches closure with the child.

Of particular relevance in this case is the "Abuse Scenario" component, pursuant to which the interviewer seeks to determine if the allegations of abuse have actually occurred. Generally, the interviewer "start[s] with open-ended questions" and "use[s] the child's spontaneity." J.A. 211. However, the interviewers are also taught to use direct questions, or yes-no questions, or multiple choice when necessary. According to

23

White, "[o]ne reason we might use a direct question is if a child has a block during the interview where they are unable or unwilling to discuss the abuse or discuss details of the abuse." J.A. 221. A "block" occurs when "the child is not willing or able to answer questions. They might shut down. They might redirect and start talking about something else." J.A. 223. It is common for a child to experience "a block whe[n] . . . [t]hey are scared to talk about something because they have been threatened or they are embarrassed." J.A. 222. Interviewers may recognize a "block" by observing the child's body language or the child's refusal to answer questions. When it appears the child is experiencing a "block," "one option is to use . . . different type[s] of question[s]" such as direct questions or yes-no questions. J.A. 222. Then, after asking the direct question, interviewers are trained to return to more open-ended questions.

White's RATAC interview of JMLO was video-recorded from start to finish and clearly demonstrates White's progression through the various RATAC steps. After successfully establishing a rapport with JMLO and taking her through the Anatomical Identification and Touch Inquiries, White asked JMLO several open-ended questions about inappropriate touching:

24

[BLACK REDACTION]

S.J.A. 45. Importantly, these first four "denials" by 5-year-old JMLO occurred either nonverbally (head shakes) or via one-word "no" answers and occurred in less than 30 seconds.

White, who testified that she noticed the change in JMLO's body language immediately upon asking the first question about her "bathing suit," then asked her whom she could tell "if something like that were to happen." JMLO replied [BLACK REDACTION] [BLACK REDACTION] S.J.A. 45. The next two "denials" by JMLO were as follows:

[BLACK REDACTION]

S.J.A. 45. Again, JMLO provided either non-verbal or muted one-word "no" answers to every open-ended question posed during the Abuse Scenario step. White then asked JMLO, "Is that okay to talk about?," to which JMLO shook her head. And when asked, "Why?," JMLO simply stated that "It's unappropriate." S.J.A. 45.

This entire exchange, including all six "denials" and accompanying pauses, took place in less than a minute and a half at the beginning of the "Abuse Scenario" portion of the RATAC interview. JMLO never denied before or after this point in the

interview that Osborne, her father, had specifically done any of these things.

White, in accordance with her RATAC training, then moved to direct questions and reassurances of safety designed to overcome the child's "block," followed by open-ended questions after the break to elicit the story, if any, in the words of the child:



J.A. 46-47. At that point, JMLO proceeded to describe in



S.J.A. 55.

Based on the results of the RATAC interview, White's written assessment was "that th[e] child was sexually abused" as described in detail during the forensic interview. White provided the following official disposition, pursuant to state law: "Sexual Abuse of [JMLO] is ruled 'Indicated,' in accordance with the provisions of [Maryland] Family Law Article 5-701 and [the Code of Maryland Regulations] 07.02.07.12 (A-2)." S.J.A. 63.

Corporal Peter Georgiades of the Harford County Sheriff's Office was assigned to investigate the case and appeared at the child advocacy center to monitor the interview of JMLO. There is no evidence in the record that Corporal Georgiades talked to JMLO before the interview. There is no evidence in the record that he knew JMLO or her mother or her father. He was not physically present in the room while White interviewed JMLO, but instead observed what transpired from another room by means of a

live video feed.  Georgiades and White were able to communicate by phone during the interview, which they did three times during the 37 minutes White talked to JMLO.

Following the interview, JMLO's mother called Osborne and relayed what JMLO had described to White during the interview. Law enforcement recorded the call.  Osborne denied JMLO's story. Rather than seek a warrant immediately, Corporal Georgiades elected to continue the investigation.  In particular, Corporal Georgiades wanted to afford Osborne an opportunity to provide an explanation for JMLO's statements; however, Georgiades' attempts to contact Osborne were unsuccessful, despite Georgiades having left his card at Osborne's residence multiple times.

On November 3, 2010, Dr. Lomonico was advised by DSS that JMLO had reported ████████████████████████████████████ ██████████████████████████████████ S.J.A. 58. Although Dr. Lomonico found "no physical signs in today's exam for sexual abuse," he concluded that "[t]his does not rule out abuse."  S.J.A. 58.  Maryland law specifically provides that "[p]hysical injury is not required for a finding of indicated sexual abuse."  Md. Code Regs. § 07.02.07.12(A)(2)(b); see also Md. Code, Fam. Law § 5-701(b)(2) (defining "abuse" to include "sexual abuse of a child, whether physical injuries are sustained or not.").  Moreover, under Maryland law, any penetration, "however slight," is sufficient to establish rape.

28

Kackley v. State, 493 A.2d 364, 366 (Md. Ct. Spec. App. 1985). White later testified without contradiction that "[i]n my experience there's seldom trauma. . . . [W]hen a doctor, Dr. Lomonico would look at a child, there is seldom evidence or an observation o[f] physical trauma." S.J.A. 34. White's experience consisted of her investigation of an average of 100 cases a year, since 2004, amounting to over one thousand cases, the majority of which were sexual abuse cases.

On December 15, 2010, six weeks after the initial statements by JMLO, Corporal Georgiades met with the prosecutor, Deputy State's Attorney Diane Tobin, to have his case assessed. After viewing the entire video of White's interview of JMLO and discussing the merits of the case with Georgiades, Tobin accepted the case for prosecution.

Despite the go-ahead from the prosecutor, Corporal Georgiades still persisted in his efforts to contact Osborne. Even after leaving his card several more times, Georgiades was not able to get Osborne to contact him. On January 14, 2011, Georgiades contacted Osborne's girlfriend by telephone, believing her to be a possible witness to the reported incidents. The girlfriend told Georgiades that Osborne did not trust the police and would not contact them, but she agreed she would encourage Osborne to call. Finally, on January 24, 2011, Osborne called Georgiades but explained that he wanted to talk

29

with his attorney before saying anything else. Osborne then ended the call.

On January 24, 2011, Corporal Georgiades applied for an arrest warrant. After recounting the allegations from JMLO's mother in his warrant application, Georgiades expressly referred to the recorded interview: "[JMLO] was brought to the [child advocacy center] on Monday 11/1/2010 and a forensic interview was conducted. The Interview was both visually and audibly recorded." J.A. 160. Georgiades then briefly summarized the portions of JMLO's interview that supported probable cause to believe that Osborne had sexually abused his daughter.

The arrest warrant was issued and Osborne was charged with 8 sexual-assault counts. Subsequently, a grand jury presented with the evidence issued a 16-count indictment for sexual-assault offenses. Osborne was held in jail for more than 8 months pending trial. Ultimately, the State's Attorney's Office placed Osborne's case on the "stet docket" rather than moving forward to trial and released Osborne.

### B.

Osborne sued the police officer. He asserted under 42 U.S.C. § 1983 that his arrest by Corporal Georgiades constituted an unreasonable seizure in contravention of the Fourth Amendment because Corporal Georgiades (1) included "fabricated" evidence in the warrant application in that he knowingly and

30

intentionally induced JMLO to invent facts supporting the sexual abuse allegations, see J.A. 330-31, and (2) omitted from his application for an arrest warrant JMLO's initial denials of sexual abuse as well as the fact that a medical examination did not reveal any physical trauma, see J.A. 332-33.

Corporal Georgiades moved for summary judgment on the basis of qualified immunity. The district court denied summary judgment, ruling that (1) a reasonable jury could conclude that Corporal Georgiades manufactured the case against Osborne by directing White to pose questions designed to mislead or confuse JMLO and (2) the omissions from Georgiades' affidavit were material to the probable cause determination. The district court reasoned that "the presence of this contradictory evidence" such as the initial denials from JMLO and the lack of trauma findings by the examining doctor "could certainly negate a finding of probable cause," meaning that "a neutral, reasonable judicial officer could choose to credit this evidence over the evidence of JMLO's account of abuse." J.A. 333 (emphasis added). As to its first decision, for reasons I will show, the district court was clearly incorrect. As to the second ruling, the district court was wrong on the law, a point acknowledged by the majority.

II.

31

We review de novo a district court's decision to deny a summary judgment motion based on qualified immunity. See Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In § 1983 actions, government officials are entitled to qualified immunity so long as they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." S.P. v. City of Takoma Park, Md., 134 F.3d 260, 266 (4th Cir. 1998) (internal quotation marks omitted). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments." Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks

32

omitted).  The application of the qualified immunity doctrine serves two purposes: first, to protect an officer from an unnecessary trial where the doctrine plainly applies at the pretrial stage, see Johnson v. Jones, 515 U.S. 304, 312 (1995), and second to prevent liability when a trial resolves facts establishing that qualified immunity is applicable, see Merchant v. Bauer, 677 F.3d 656, 665 n.6 (4th Cir. 2012).

In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, we employ a two-part inquiry.  See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014) (per curiam).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.  The first question is "whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a federal right."  Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015); see Saucier v. Katz, 533 U.S. 194, 201 (2001).  "The second [question] of the qualified-immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional."  Ray, 781 F.3d at 100; see Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006).  "The answer to both . . .

33

questions must be in the affirmative in order for a plaintiff to defeat a defendant police officer's motion for summary judgment on qualified immunity grounds." Miller v. Prince George's Cty., Md., 475 F.3d 621, 627 (4th Cir. 2007) (internal alteration and quotation marks omitted). As neither question can be answered in the affirmative in this case, Corporal Georgiades is entitled to summary judgment based on qualified immunity.

### A. No Constitutional Violation

Osborne claims that he was arrested without probable cause in violation of the Fourth Amendment's guarantee against unreasonable seizures. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." Brooks v. City of Winston–Salem, N.C., 85 F.3d 178, 183 (4th Cir. 1996). Osborne was arrested pursuant to a warrant, and the Fourth Amendment does not permit the issuance of a warrant "but upon probable cause." U.S. Const. amend. IV. An arrest made pursuant to a facially valid warrant may be presumed to rest upon probable cause, and Osborne does not contend that the arrest warrant was invalid on its face.

Rather, Osborne claims that Corporal Georgiades misled the magistrate by including facts he knew to be false and by omitting material facts from the warrant application. Our analysis, therefore, is guided by Franks v. Delaware, 438 U.S.

34

154 (1978), "as to whether asserted material false statements and omissions in the . . . supporting affidavit[] . . . state a constitutional claim." Evans v. Chalmers, 703 F.3d 636, 649-50 (4th Cir. 2012). To succeed on his claim, Osborne must prove that Corporal Georgiades deliberately or with a "reckless disregard for the truth" made false statements of material fact in his affidavit, Franks, 438 U.S. at 171, or omitted from that affidavit "material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading," United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (internal quotation marks omitted). Furthermore, to establish his claim, Osborne must prove that the fabricated or omitted facts were material. "It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is necessary to the finding of probable cause." Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994) (emphasis added) (internal quotation marks omitted).

1. The Alleged False Statements in the Warrant Affidavit

Osborne contends that JMLO's account of sexual abuse was false, resulting from coercive interview techniques and pressure applied by Corporal Georgiades. And, according to Osborne, the inclusion of this manufactured account in Georgiades' warrant affidavit resulted in the issuance of the warrant and his

35

unreasonable seizure.  The district court found that "a reasonable jury could certainly conclude that Corporal Georgiades exerted pressure that resulted in the fabrication of evidence against [Osborne]" based solely on the following:  that Corporal Georgiades spoke by phone with White three times during the interview and that Corporal Georgiades ended the interview after JMLO indicated ████████████████████████████ ██████  J.A. 331.

The district court's conclusion, in my view, finds absolutely no support in the record and amounts to rank speculation.  To survive summary judgment here, Osborne must adduce evidence showing that Corporal Georgiades deliberately caused fabricated or falsified evidence.  See Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); Myers v. Morris, 810 F.2d 1437, 1458 (8th Cir. 1987) (requiring "a specific affirmative showing of dishonesty"), abrogated on other grounds, Burns v. Reed, 500 U.S. 478 (1991).  It is Osborne's burden to produce evidence of fabrication, not Georgiades' burden to negate it.

Georgiades asserted a general right to qualified immunity in his opening brief to this court, but the majority is correct that he did not specifically challenge the district court's ruling on the fabrication allegation. I think nevertheless we should reach this issue for several reasons. First, Georgiades

36

in his brief did claim the defense of qualified immunity. When this defense is presented, a court may determine whether there is proof that the official violated the plaintiff's constitutional rights. Second, the record irrefutably shows there was no fabrication of evidence. There is not a shred of evidence of any coercion or any fabrication of any type. Third, Georgiades's lawyer used a substantial portion of her oral argument to challenge the allegations of fabrication and she was thoroughly questioned by judges on the panel about it, all without anyone objecting to its relevance or suggesting that waiver precluded counsel from adressing the fabrication issue. Fourth, given the importance of the interest the court has in eliminating baseless claims early on, I would take this opportunity to address and get rid of this allegation.

Osborne presented absolutely no evidence suggesting that Georgiades somehow manipulated JMLO into falsely accusing Osborne of sexual abuse, and the district court relied upon sheer speculation in concluding otherwise. The sole factual basis for the district court's opinion was that Corporal Georgiades and White spoke by telephone during the interview. From that fact and that fact alone, the district court conjectured that Georgiades directed White to ask questions designed to manipulate JMLO into falsely accusing Osborne of abuse. The majority apparently believes we are bound by the

37

opinion of the district court. If there were any facts in the record to support his conclusion, I might agree. But this record is completely devoid of any evidence that Officer Georgiades exerted any pressure or fabricated any evidence.

First and foremost, the child had already told White about Osborne's molestation of her and described in detail what Osborne had done to her before there was the first phone conversation between Corporal Georgiades and White. This fact alone renders the fabrication claim frivolous. Second, there is absolutely no evidence in the record at all as to what was said during those phone conversations. And, third, neither the district court in its order nor Osborne on appeal identified a single improper question posed to JMLO during the interview, which was recorded from start to finish and followed the widely-accepted RATAC forensic interview model. Thus, there is simply no evidence that Georgiades violated Osborne's constitutional rights by causing fabricated evidence to be elicited during that interview and this claim should be eliminated.

2. Information Omitted from the Warrant Application

Osborne also claims that Corporal Georgiades deliberately or with a reckless disregard for the truth omitted important "contradictory evidence" from the warrant application--namely JMLO's initial denials of abuse and the "dearth of any physical evidence of abuse," J.A. 333—in order to mislead the magistrate

38

into issuing a warrant. The district court denied summary judgment, concluding (1) that a reasonable factfinder could decide that Corporal Georgiades had the requisite intent to mislead the magistrate, and (2) that the omitted "contradictory evidence" was material because it "could certainly negate a finding of probable cause." Id. In my view, and with due respect for the district court, these decisions were clearly in error.

### a. Intent

"To satisfy the Franks' intentional or reckless falsity requirement for an omission, the defendant must show that facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." United States v. Tate, 524 F.3d 449, 455 (4th Cir. 2008) (internal quotation marks omitted). That is, "the omission must be designed to mislead or must be made in reckless disregard of whether it would mislead." Id. (internal quotation marks and alteration omitted). To establish "reckless disregard," the defendant must show that the "officer failed to inform the judicial officer of facts he knew would negate probable cause." Miller, 475 F.3d at 627 (internal question marks and alteration omitted).

Officers applying for a warrant "cannot be expected to include in an affidavit every piece of information gathered in

39

the course of an investigation," Colkley, 899 F.2d at 300, and they are "not required to include every piece of exculpatory information in [such] affidavits," Evans, 703 F.3d at 651. Not every omission amounts to a constitutional violation:

> [B]ecause every piece of information cannot be expected to be included, the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information. Certainly, such intentional omissions do not satisfy the requirement of Franks. . . . [If] this type of intentional omission is all that Franks requires, the Franks intent prerequisite would be satisfied in almost every case. Accordingly, merely showing an intentional omission of a fact from a warrant affidavit does not fulfill Franks' requirements.

Tate, 524 F.3d at 455 (internal quotation marks and citations omitted).

Other than the mere fact that Corporal Georgiades omitted JMLO's initial denials and the inconclusive medical report, the record is bereft of evidence suggesting that he misled the issuing magistrate intentionally or recklessly. In fact, all of the evidence is to the contrary. Neither the district court nor Osborne point to any evidence of the required intent other than the fact that allegedly contradictory evidence was omitted. The district court concluded that a jury could infer the requisite intent or recklessness from the mere fact of omission itself. This court, however, has refused to embrace "the validity of inferring bad motive under Franks from the fact of omission [of

40

contradictory information] alone, for such an inference collapses into a single inquiry the two elements—'intentionality' and 'materiality'—which <u>Franks</u> states are independently necessary." <u>Colkley</u>, 899 F.2d at 301. In <u>Colkley</u>, we concluded that the defendant failed to show that the officer applying for the warrant intended to mislead the magistrate even though he omitted from his affidavit the fact that <u>none of the six eyewitnesses were able to identify defendant</u> out of a photo lineup and that he used only the height description provided by one eyewitness but did not mention that other witnesses indicated the bank robber was shorter than the defendant. <u>See id.</u> at 300-01. Likewise, in <u>Simmons v. Poe</u>, we held that an officer had not acted with a reckless disregard for the truth where he included in his affidavit only the profile factors that were consistent with the suspect and omitted several inconsistent profile factors as well as the victim's initial belief that her attacker was of a different race. <u>See</u> 47 F.3d 1370, 1383-84 (4th Cir. 1995).

The record does not create any question of fact as to whether Georgiades omitted JMLO's initial denials or the results of the medical examination with the intent to mislead the magistrate or with a reckless disregard for the truth. In fact, I am unable to find any evidence in the record showing that Georgiades even knew about the existence of Dr. Lomonico's

41

report before he applied for the warrant. Actually, insofar as the record contains facts relating to Corporal Georgiades' intent with regard to the arrest warrant, they suggest that he harbored no deceit and wanted to make sure he covered all his bases before arresting Osborne. He had seen the interview of the little girl. The opinion of Dion White, the experienced social worker who interviewed JMLO, was that sexual abuse of JMLO had indeed occurred. He knew the child's father had told her not to tell anybody about what he had done. In addition, prior to applying for the arrest warrant, Georgiades took the recording of the interview to Tobin, the prosecutor, for her assessment of the case. After watching the interview, which included JMLO's initial denials, and discussing the merits of the case with Georgiades, Tobin wanted to move forward with the prosecution. Only after receiving the go-ahead from the prosecutor did Georgiades prepare and submit his warrant application, which specifically stated that there was a recording of JMLO's interview. Thus, he disclosed the video to the magistrate who could have watched and seen for himself what JMLO said if he so desired.

The consultation with Tobin shows, at the least, that Georgiades fully disclosed his evidence to the legal expert who was assigned by the State of Maryland to handle the case. Georgiades also extended to Osborne numerous invitations to tell

42

his side of the story.  None of the evidence points to an intent to "railroad" Osborne.  Accordingly, Osborne has failed to establish the requisite intent required to sustain his claim that Georgiades violated his constitutional rights.

### b.  Materiality

"It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is <u>necessary</u> to the finding of probable cause."  <u>Wilkes</u>, 28 F.3d at 1365 (emphasis added) (internal quotation marks omitted).  Where a plaintiff alleges that an officer has omitted material facts, he must establish that <u>without such omissions there would have been no probable cause</u>.  See  <u>Miller</u>, 475 F.3d at 632 ("[T]he Constitution [does] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause.").

In concluding that the facts omitted from Georgiades' affidavit were material, the district court did not apply the correct standard of materiality.  The district court stated that the omitted facts had the "potential to negate probable cause" and that a "reasonable judicial officer could choose to credit this evidence over the evidence of JMLO's account of abuse." J.A. 333.

43

This court rejected virtually this same formulation of materiality in Colkley, where the district court "believed that the affiant's omission was material because it 'may have affected the outcome' of the probable cause determination." 899 F.2d at 301. We explained that the court had "misstated" the Franks materiality standard, under which "an omission must do more than potentially affect the probable cause determination: it must be necessary to the finding of probable cause." Id. (emphasis added) (internal quotation marks omitted).* The possibility that the omitted facts could be credited by a magistrate over the facts included in the warrant affidavit does not make such facts material under this standard. For the omitted facts to be material, their inclusion in the warrant affidavit must necessarily defeat probable cause. See id.

In order to assess the materiality of an omission, we must insert the omitted information "and then determine whether or

---

*We further noted that the idea that a warrant affidavit must include "potentially exculpatory evidence" was akin "to import[ing] the rule of Brady v. Maryland into the warrant application process." United States v. Colkley, 899 F.2d 297, 302 (4th Cir. 1990) (internal citation omitted). Brady is concerned with the fairness of criminal trials and "with the justice of the finding of guilt that is appropriate at trial," while Franks "recognizes that the information an affiant reports . . . may not ultimately be accurate . . . so long as the affiant did not deliberately mislead the magistrate." Id. at 303 (internal quotation marks omitted). Thus, "a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process." Id.

44

not the 'corrected' warrant affidavit would establish probable cause." Miller, 475 F.3d at 628 (internal quotation marks omitted). Even if JMLO's initial denials and the result of Dr. Lomonico's examination had been inserted into Corporal Georgiades' affidavit, there was still a sufficient basis for a reasonable jurist to find probable cause. The affidavit described the statements made by JMLO during her forensic interview and included details from JMLO regarding sexual activity that would have been beyond the understanding and experience of a typical five-year old. And the medical report did not necessarily negate JMLO's claims, as Dr. Lomonico himself seemed to recognize, expressly stating that his exam did not rule out abuse. The conflicting evidence presented a question for the jury as to JMLO's credibility and the ultimate guilt of Osborne, but it did not necessarily defeat probable cause for an arrest.

B.  No Clearly Established Constitutional Right

Because "[q]ualified immunity shields an officer from suit when []he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances," we focus our inquiry on the body of law at the time of the police conduct to determine "whether the officer had fair notice that [the] conduct was unlawful." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam). The clearly-

45

established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  But "[w]e do not require a case directly on point" to find the requirement satisfied so long as "existing precedent [has] placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted).

In deciding whether an officer's conduct violated clearly established law, "we have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established."  *Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. 2013) (internal quotation marks and alteration omitted).

> In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the cases arose. . . . If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense.

*Id.* (internal quotation marks omitted).

The district court determined, and my friends in the majority agree, that Corporal Georgiades should have understood that his conduct was unlawful because it was clearly established in 2010 under *Franks v. Delaware* that an officer violates the constitution by deliberately, or with a "reckless disregard for

46

the truth," omitting material facts from an arrest warrant affidavit. 438 U.S. at 155-56.

Although the general Franks principle is unquestionably well-established, we do not stop there. The law requires that we go farther and assess the right in a more particularized sense in the context of the specific facts of this case. As the Supreme Court has admonished, courts must not "define clearly established law at a high level of generality," al-Kidd, 131 S. Ct. at 2084, but rather must identify a constitutional right that was "'clearly established' in a more particularized, and hence more relevant, sense," Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Thus, even though it was clearly established on a general level that an officer could not omit material facts from a warrant application with a reckless disregard for the truth, the contours of this right were not clearly established by Supreme Court or Fourth Circuit precedent in the particularized context of this case. In light of cases such as Colkley and Simmons, it was not clear that Officer Georgiades' omissions, which would not have defeated probable cause, were unconstitutional. The majority cannot cite a single case to show that the right they claim was clearly established. The general rule established by Franks did not afford Corporal Georgiades fair notice that his specific conduct was unlawful, and my friends in the majority

47

cannot show that such conduct was contrary to clearly established law.

## III.

## A.

Georgiades argued that the issuance of the indictment settled the question of whether there was probable cause for the prior arrest of Osborne. The indictment is regular on its face and there are absolutely no allegations in Osborne's complaint asserting any wrongdoing or improprieties in the proceedings before the Grand Jury. Likewise there is no evidence in the Joint Appendix regarding what evidence the Grand Jury had before it. There being nothing out of the ordinary regarding the Grand Jury proceedings or the indictment, I would not speculate about what might have happened or what could have happened in the Grand Jury room. I would hold at the very least that the indictment broke any chain of causation that might have existed. See Durham v. Horner, 690 F.3d 183, 189-90 (4th Cir. 2012).

Besides, there was an independent decision made by the prosecutor that the evidence was strong enough to go forward with the case before Officer Georgiades ever sought a warrant. It is uncontradicted that Officer Georgiades went over the merits of his case with Diane Tobin, the Deputy State's Attorney, before making an arrest. Tobin watched the entire video of the child's statements, including the "denials" at the

48

beginning of the interview and nevertheless accepted the case for prosecution. We should remember here that in a malicious prosecution context, similar in principle to the issues before us, we quoted with approval the following statement:

> A law enforcement officer who presents all relevant probable cause evidence to a prosecutor . . . is insulated from a malicious prosecution claim where such intermediary makes an independent decision . . . unless the officer (1) concealed or misrepresented facts or (2) brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne.

Evans v. Chalmers, 703 F.3d 636, 648 (4th Cir. 2012) (internal quotation marks omitted).

Here, there is no evidence either exception applies, and the approval of the case for prosecution by the Deputy State's Attorney and her subsequent submission of the case to the Grand Jury should insulate Officer Georgiades from any liability because he sought and obtained this prosecutor's independent evaluation before he ever applied for an arrest warrant. She saw the "denials" and still advised Officer Georgiades she would go forward with the case. Under these circumstances, no fault can be attributed to the officer, and he should receive the benefits of immunity as well as our commendation for the appropriate steps he took.

The majority would not reach this issue because it was not argued to the district court. Although it does appear to be

raised for the first time on appeal, I would reach it for two reasons: First, Osborne did not object to this question being before us and in fact briefed the issue for our consideration. Second, there is no evidence, or even any allegations, of any wrongdoing with regard to the grand jury indictment or the submission of the case to the prosecutor for a legal evaluation.

B.

My friends in the majority and I agree that the district court used the wrong standard to evaluate the effect of the omissions on the question of probable cause. The correct test is whether the omissions necessarily negated probable cause. My friends do not believe the child's responses are reasonably reliable to establish even probable cause because, in their view, what five-year-old JMLO relates about the two nights cannot be squared with her initial denials and lack of physical injury.  I must be watching a different interview video because I see nothing that negates probable cause or warrants such a dismissal of a five-year-old victim's account of her abuse.

The events the child described happened on two separate nights that her father had her in his bed, and it was not necessary for the interviewer to try to make JMLO pinpoint exactly what action or what statements were made on which nights.  What I do see is a five-year-old girl telling an experienced forensic interviewer—both verbally and

50

demonstratively with dolls—about sex acts committed on her. And it strains reason to conclude that she was coached or manipulated by anyone into making these graphic sexual statements during the interview. As I pointed out earlier, the "denials" that my friends make so much of do not bother me in the least. I frankly do not see how a five year old child's initial refusal to talk to a stranger about being sexually abused by her father, who has told her not to tell anyone about what he did, can have anything more than a fleeting effect on an evaluation of the truthfulness of her description of what happened to her. And the doctor's report does not count for much, as it is equivocal and expressly does not exclude the prior occurrence of some type of sexual abuse. Given that sexual abuse does not necessarily result in trauma, I would not hesitate in saying the doctor's report does not negate the probable cause established by JMLO's descriptions of what happened. In short, the so-called omissions were not material and do not come close to preventing the arrest of Osborne.

### IV.

The majority relies on the prudential doctrine of waiver to dispose of virtually every issue in this appeal, including the question of whether the law was clearly established at the time of Corporal Georgiades's alleged constitutional violations. An appellate court, of course, always possesses discretion to reach

51

an otherwise waived issue.  See United States v. Vinson, 805 F.3d 120, 122 n.1 (4th Cir. 2015).  But the circumstances in the case before us make it particularly appropriate that we exercise our discretion to decide whether the law was clearly established.

First, it is especially proper that an appellate court reach an otherwise waived issue if that issue is logically antecedent to, and ultimately dispositive of, the dispute before it.  For example, in United States National Bank of Oregon v. Independent Insurance Agents of America, the Supreme Court concluded that the Eleventh Circuit Court of Appeals had properly decided an issue first raised in supplemental post-argument briefing, even though the appellants had failed to raise it in either their opening or reply brief.  See 508 U.S. 439, 447 (1993).  The Court reached this conclusion because the issue which had not been raised was "antecedent to" and "dispositive of" the question addressed in the opening brief. Id.

The same reasoning applies here. The question of whether the law was clearly established is "antecedent to" and, if decided in the appellants' favor, "dispositive of" the issue that is before us on appeal—whether Corporal Georgiades is shielded from trial by qualified immunity.  If the law was not clearly established, then it is irrelevant whether or Corporal

Georgiades actually violated the law because he would be shielded by qualified immunity and, as a result, entitled to judgment as a matter of law. See Behrens v. Pelletier, 516 U.S. 299, 306 (1996) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." (internal quotation marks omitted)).

Second, the standard policy bases for applying the waiver doctrine do not apply with the same force in the qualified immunity context. Much like the final judgment rule, see 19 James Wm. Moore, Moore's Federal Practice § 201.10[1] (3d ed. 2011) ("The purposes of the final judgment rule are to avoid piecemeal litigation, [and] to promote judicial efficiency . . . ."), the waiver doctrine aims to "preserve[] judicial resources," United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Qualified immunity is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Accordingly, even though interlocutory appeals are generally disfavored, immediate review of a district court's denial of a claim of qualified immunity is permitted "to the extent that it turns on an issue of law." Id. at 530. Likewise, in light of the strong policy favoring an official's "entitlement not to

53

stand trial or face the other burdens of litigation," id. at 526, we should exercise our discretion here and decide whether the law was clearly established at the time of the alleged violation—all the more so where, as here, the question is not even close on the merits.

Finally, the majority's dogged application of waiver produces an ironic result. Even if Georgiades did not raise qualified immunity in this appeal, he raised it as an affirmative defense in his answer to the complaint and will thus be permitted to press the defense when the case goes to trial. In my view, the majority's insistence on avoiding the merits and applying the waiver rule in this case does nothing except kick the can down the road.

V.

The initial denials by JMLO are consistent with common experience in child sexual abuse cases where threats, or innocent promises by children to keep a secret, are the norm and easily account for the denials that are so familiar to those who work in this area. Likewise, the fact that there was no physical trauma. The absence of this information in a warrant application does not undermine the probable cause established by this five-year-old girl's detailed description of the sexual abuse by her father.

54

Finally, the majority has elected not to publish this case. The redeeming feature of this choice is that under our law this case cannot be used in the future as legal authority for qualified immunity purposes. In that context, thankfully, it will be irrelevant. See Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc) ("Since unpublished opinions are not even regarded as binding precedent in our circuit, such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity."). Nevertheless, I dissent because, in my view, the lower court decision must be reversed.